339 F.3d 129
 Myra ANTHONY and Magdalene Wright, Plaintiffs-Appellants,
v.
CITY OF NEW YORK, New York City Health & Hospitals Corporation, Richard Collegio, Gerald Migliaro, and John Does 1, 2, and 3, both individually and in their official capacities, Defendants-Appellees.
 No. 01-7978(L).
 No. 02-7648(CON).
 United States Court of Appeals, Second Circuit.
 Argued: December 9, 2002.
 Decided: August 8, 2003.
 
 COPYRIGHT MATERIAL OMITTED RICHARD A. ALTMAN, New York, NY, for Plaintiffs-Appellants.
 JANET L. ZALEON, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, Kristin M. Helmers, Susan B. Eisner, on the brief), New York, NY, for Defendants-Appellees.
 AMANDA MASTERS, Cadwalader, Wickersham & Taft (Isaac S. Greaney, on the brief), New York, NY, for amici curiae New York Lawyers for the Public Interest, Inc., New York Civil Liberties Union, Center for Constitutional Rights, and Urban Justice Center.
 Before: NEWMAN, SACK, and SOTOMAYOR, Circuit Judges.
 SOTOMAYOR, Circuit Judge.
 
 
 1
 Plaintiff-appellant Myra Anthony is an adult woman with Down Syndrome. Plaintiff-appellant Magdalene Wright is Anthony's half-sister and legal guardian. On March 7, 2000, officers from the New York City Police Department ("NYPD") responded to a 911 call that originated from Wright's apartment, in which a female caller reported that she was being attacked by a man with a knife and gun. The police entered Wright's apartment, found Anthony alone, and were unable to locate Anthony's caretaker. The police then transported Anthony to the psychiatric ward of Kings County Hospital, a municipal hospital owned and operated by the New York City Health and Hospitals Corporation ("HHC"), where she was detained overnight and given blood and urine tests as well as anti-psychotic medication. Anthony was released from the hospital the next morning.
 
 
 2
 Plaintiffs brought suit in the United States District Court for the Southern District of New York (Denise L. Cote, J.), alleging violations of the Fourth and Fourteenth Amendments, violations of the Americans with Disabilities Act ("ADA"), and various state-law tort claims against defendants-appellees the City of New York, HHC, and several NYPD officers both individually and in their official capacities. The parties cross-moved for partial summary judgment, and the district court granted defendants' motion in its entirety. Plaintiffs then voluntarily dismissed their remaining claims with prejudice in order to pursue this appeal.
 
 
 3
 We affirm the district court's grant of summary judgment on all claims that plaintiffs have asserted on appeal. There is no individual liability pursuant to Anthony's § 1983 claims based on alleged Fourth Amendment violations: We hold that the warrantless entry was justified by exigent circumstances and did not violate the Fourth Amendment, and we find it unnecessary to decide whether the warrantless seizure was a Fourth Amendment violation because the officers involved are entitled to qualified immunity. Nor can Anthony recover on her § 1983 claims against the City of New York and the officers in their official capacities, because there is no evidence that the warrantless seizure (assuming it was unconstitutional) was conducted pursuant to an official governmental policy or custom. Anthony's argument that the City of New York violated the ADA also fails, because there is no evidence that the warrantless seizure was motivated by discrimination against individuals with disabilities.
 
 
 4
 In addition, we affirm the district court's grant of summary judgment against Anthony on her § 1983 claims against HHC for violations of the Fourth and Fourteenth Amendments, holding that HHC's actions did not violate Anthony's constitutional rights. Finally, we affirm the district court's grant of summary judgment against Wright on her familial association claim, as we hold that Anthony's seizure and confinement did not constitute a substantive due process violation.
 
 
 5
 The judgment of the district court is affirmed.
 
 BACKGROUND
 
 6
 Plaintiff-appellant Myra Anthony is a woman with Down Syndrome and a citizen of the Commonwealth of Dominica, West Indies. [JA 59] The abilities of individuals with Down Syndrome vary; Anthony is able to clean and dress herself, cook meals, and clean the house.[1] [JA 283-84] Anthony speaks a dialect of English colloquially referred to as "Jamaican speech," common in the West Indies. [JA 291-92] At the time of the events at issue in this case, Anthony was in the United States on a valid medical visa to receive treatment for a hearing problem, and was staying with her half-sister and legal guardian, plaintiff-appellant Magdalene Wright. [JA 63-64]
 
 I. Factual Background
 
 7
 On March 7, 2000, a 911 call was placed from Wright's apartment in Brooklyn. [JA 336] The "SPRINT report," a document that records the notes taken by a 911 operator during a call, memorializes the thirteen-minute call as follows:
 
 
 8
 FC [female caller] SPKS FRENCH — WAS CONNCTD TO [ ] 911 BY BELL ATLANTIC — FC STILL ON LINE UNABLE TO UNDERSTAND HER — SPKG UNK LANGUAGE — FEML SOUNDS INCOHERENT — POSS EDP [emotionally disturbed person] FEML AT LOC — FC ON LINE RAMBLIN ON — FC STS SHE IS 5 YO [years old] — FC SOUND OLDER THN 5 YO — STILL ON LINE W FEML — FEML STS SHE SPKS CREOLE — FC STS HUSB TOLD HER HE DOES NOT LIKE YOU — FC STS HUSB BEAT ON HER — FC STS HUSB — HAS A KNIFE & A GUN — UNK WPNS AT LOC — WHILE FEML ON LINE HEARD SOMEONE KNOCKIN ON DOOR — UNITS ARE INSIDE
 
 
 9
 [JA 336] Several NYPD officers responded to a subsequent dispatch, including Officers Richard Collegio and Gerald Migliaro. Officers Collegio and Migliaro were not the first officers on the scene, and it is unclear from the record how the first-responding officers entered Wright's apartment — there was no property damage or other evidence of forcible entry, but neither is there evidence that Anthony affirmatively consented to the officers' entry.
 
 
 10
 Officers Collegio and Migliaro have significantly different recollections of Anthony's conduct while the police were in the apartment. Officer Collegio testified in his deposition that Anthony "did not appear to be well-kept, and she was not acting rationally.... She was crying, she was screaming and she was not calm." [JA 145] Officer Migliaro, by contrast, testified in his deposition that Anthony was sitting calmly in a chair while the police were in the apartment, and that he did not hear her speaking to any of the officers. [JA 191-92] Construing the facts in the light most favorable to plaintiffs, as we must in reviewing this grant of summary judgment against them, we will assume that Anthony was sitting quietly and calmly while the police searched the apartment, and that she did not communicate with the officers or explain why a 911 call was made.
 
 
 11
 While the police were inside, a neighbor arrived and told them that Wright was the lessee of the apartment. [JA 151] The officers searched the house for information they could use to contact Wright but were unable to get in touch with her after trying half a dozen phone numbers they had found. [195-98] The officers discussed the situation, and a superior officer, Sergeant Mendez, ordered Officers Collegio and Migliaro to seize Anthony and take her to the hospital. [JA 156, 202-08] Anthony was handcuffed and transported by ambulance to Kings County Hospital. [JA 202] The officers left a note at the apartment for Wright that stated: "MAGDALENE: 70 [PRECINCT] RESPONDED TO YOU[R] HOUSE AND TOOK [ANTHONY] TO KINGS COUNTY HOSPITAL TO BE CHECKED OUT." [JA 342]
 
 
 12
 Wright returned home that afternoon, saw the note, and attempted to contact the police and Kings County Hospital. [JA 68-69] About half an hour later, an officer called Wright at home and told her that she could find Anthony in the psychiatric ward of Kings County Hospital. [JA 69] Wright immediately went to the hospital and was allowed to visit Anthony but not to take her home; Wright states that an unidentified hospital employee told her it was "normal procedure" to keep Anthony for observation. [JA 70-71] On Wright's request, she was allowed to spend the night with Anthony in Anthony's hospital room. [JA 72]
 
 
 13
 Hospital documents describe the hospital staff's evaluations of and responses to Anthony's behavior. The Ambulance Call Report indicates that Anthony was "very aggressive" in transport to the hospital, but was "able to be calmed." [JA 80] She was admitted to the hospital under a diagnosis of "Unspecified Psychosis"; after an initial exam, the principal diagnosis was listed as Down Syndrome, with secondary diagnoses of "Unspecified Mental Retardation" and "Unspecified Hearing Loss." [JA 74-75] Anthony was given a psychiatric evaluation, which described her as fearful, anxious, delusional, and paranoid. [JA 82-86] The hospital took blood and urine samples from Anthony to test for drug use, and also administered sedatives and anti-psychotic medication. [JA 110-33] She was discharged the next morning with no scheduled follow-up. [JA 137]
 
 II. The District Court Proceedings
 
 14
 In June 2000, plaintiffs filed a complaint in the district court against the City of New York, HHC, Officers Collegio and Migliaro, and several "John Doe" officers, and sought damages based on alleged violations of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983, violations of the Americans with Disabilities Act ("ADA"), Pub.L. No. 101-336, 104 Stat. 327 (codified at 42 U.S.C. § 12101 et seq.), and various state-law tort claims. After discovery, the parties cross-moved for partial summary judgment, and the district court granted defendants' motion in full. See Anthony v. City of New York, 2001 WL 741743 (S.D.N.Y. July 2, 2001). Plaintiffs agreed voluntarily to withdraw their remaining claims, and those claims were dismissed with prejudice. [SPA 36-37]
 
 
 15
 Plaintiffs filed a notice of appeal to this Court. Subsequently, however, plaintiffs filed a motion in the district court pursuant to Fed.R.Civ.P. 60(b) and 15(a), requesting that the district court vacate the final judgment and seeking leave to amend the complaint to add a new claim. The district court denied both motions in a written opinion. See Anthony v. City of New York, 2002 WL 731719 (S.D.N.Y. Apr. 25, 2002). Plaintiffs then appealed the final judgment to this Court.
 
 DISCUSSION
 I. Standard of Review
 
 16
 We review the district court's grant of a motion for summary judgment de novo, resolving all ambiguities and drawing all factual inferences in plaintiffs' favor as the non-moving party. See Weinstock v. Columbia Univ., 224 F.3d 33, 40-41 (2d Cir. 2000). Summary judgment is proper only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 17
 II. Anthony's Claims Stemming from the Events at Wright's Home
 
 
 18
 Anthony raises a number of claims on appeal stemming from the conduct of the police officers who responded to the 911 call from Wright's apartment. She first alleges that the warrantless entry into Wright's apartment violated the Fourth Amendment, and that this constitutional violation supports a § 1983 claim for damages against Officers Collegio and Migliaro in their individual capacities. Anthony next alleges that the warrantless seizure for the purpose of involuntarily hospitalizing her also violated the Fourth Amendment, and that this constitutional violation supports a § 1983 claim for damages against Officers Collegio and Migliaro individually, the City of New York, and the named and unnamed police officers in their official capacities. Finally, Anthony claims that she is entitled to damages under Title II of the ADA, arguing that by seizing and involuntarily hospitalizing her, the City of New York intentionally discriminated against her on the basis of her disability. We address these arguments in turn.
 
 
 19
 A. The Warrantless Entry — Anthony's § 1983 Claim Against Officers Collegio and Migliaro Individually
 
 
 20
 Section 1983 exposes any person acting under color of law to liability for money damages if he or she "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Anthony raises a § 1983 claim against Officers Collegio and Migliaro in their individual capacities, based on the allegedly unconstitutional warrantless entry into Wright's apartment.
 
 
 21
 The Fourth Amendment protects individuals against unreasonable searches and seizures. See U.S. Const. amend. IV. To be reasonable under the Fourth Amendment, a search of a home must either be conducted pursuant to a warrant or meet an exception to the warrant requirement. See Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Among the recognized exceptions to the warrant requirement is the presence of exigent circumstances:
 
 
 22
 The warrant requirement of the Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home. It is well-settled, however, that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay....
 
 
 23
 The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an "urgent need" to render aid or take action.
 
 
 24
 United States v. MacDonald, 916 F.2d 766, 769 (2d Cir.1990) (in banc) (citations omitted) (quoting Dorman v. United States, 435 F.2d 385, 391 (D.C.Cir.1970) (in banc)).
 
 
 25
 In granting summary judgment for defendants on this claim, the district court found that no reasonable jury could conclude other than that exigent circumstances existed sufficient to justify the warrantless entry. Anthony, 2001 WL 741743, at *4 ("The issue of whether exigent circumstances existed is quickly resolved. Because it was reasonable for the officers to believe that there was an armed man in Wright's apartment who was committing a violent crime against the caller, exigent circumstances justified the officers' warrantless entry into Wright's apartment."). In its later ruling on plaintiffs' Rule 60(b) motion, the district court further explained that "the substance of the [911] call — a plea for help from a terrified woman who claimed to be under attack — created exigent circumstances justifying, and indeed requiring, an immediate response." Anthony, 2002 WL 731719, at *5. The district court thus found that the substance of the 911 call provided the exigent circumstances that justified the warrantless entry as a matter of law.
 
 
 26
 On appeal, Anthony argues that the district court's conclusion contravenes our recent holding that the police may not rely solely on an "anonymous and uncorroborated 911 call to justify a warrantless entry into a private dwelling." Kerman v. City of New York, 261 F.3d 229, 238 (2d Cir.2001). The facts of the instant case are different from those of Kerman, however. The call in Kerman came from an anonymous caller who directed the police to a different location than that from which the call was placed, without verification or corroboration of the connection between the caller and the location to which the police responded. See id. at 235. In the instant case, the call came from the same location to which the police responded, and more importantly, the caller described an immediate and deadly threat of harm to which she herself was being exposed at that location. The concern we expressed in Kerman regarding the reliability of anonymous and uncorroborated calls — that is, calls reporting an emergency at a different location and involving someone other than the caller — is not implicated here, where the caller expressed an immediate risk of harm to herself, and where the address from which the call was placed was verified.[2] See Florida v. J.L., 529 U.S. 266, 276, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (Kennedy, J., concurring) (noting that instant caller identification can provide a check against unreliable anonymous calls). We hold that the substance of this 911 call thus created exigent circumstances justifying the warrantless entry,[3] and we affirm the district court's grant of summary judgment for defendants on the § 1983 claim based on the warrantless entry.[4]
 
 B. The Warrantless Seizure
 
 27
 It is undisputed that Anthony was "seized" within the meaning of the Fourth Amendment when she was handcuffed and taken to Kings County Hospital. See Appellees' Brief at 26. It is also undisputed that the officers did not have a warrant for her seizure. Anthony alleges that the seizure and subsequent hospitalization violated the Fourth Amendment, and that this constitutional violation supports her § 1983 claim for damages against Officers Collegio and Migliaro individually, the City of New York, and the named and unnamed police officers in their official capacities.
 
 
 28
 1. Anthony's § 1983 Claim Against Officers Collegio and Migliaro Individually
 
 
 29
 A warrantless seizure for the purpose of involuntary hospitalization "may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized" is dangerous to herself or to others. Glass v. Mayas, 984 F.2d 55, 58 (2d Cir.1993) (quoting Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir. 1992)) (internal quotation marks omitted); accord Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir.1997) ("The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others.").
 
 
 30
 Reading the facts in the light most favorable to Anthony, we credit that part of the officers' deposition testimony that described her as sitting calmly and quietly (although uncommunicatively) in Wright's apartment while the officers searched the apartment and attempted to contact Wright. [JA 189-94] We reiterate as well, however, that the facts also showed that Officers Collegio and Migliaro knew they were responding to a 911 call from a woman inside the apartment who claimed to be at risk of immediate physical injury, requested assistance, and was potentially "emotionally disturbed." [JA 178, 356]
 
 
 31
 On this factual record, we decline to determine as a matter of law whether Officers Collegio and Migliaro had probable cause to seize Anthony and transport her to Kings County Hospital. We do not, however, disturb the district court's grant of summary judgment for defendants on this claim, because even if the seizure did violate Anthony's Fourth Amendment rights, Officers Collegio and Migliaro are entitled to qualified immunity for their actions.
 
 
 32
 Police officers are immune from liability for money damages in suits brought against them in their individual capacities if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We have explained that "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was `objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995) (quoting Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); see also Weyant v. Okst, 101 F.3d 845, 857 (2d Cir.1996) ("[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."). A police officer's actions are objectively unreasonable, and therefore are not entitled to immunity, when "no officer of reasonable competence could have made the same choice in similar circumstances." Lennon, 66 F.3d at 420-21 (citing Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).
 
 
 33
 We hold that Officers Collegio and Migliaro are entitled to qualified immunity for their seizure of Anthony. In addition to the circumstances of which Officers Collegio and Migliaro were aware from their receipt of the 911 dispatch and their personal observations inside the apartment, it is undisputed that Officers Collegio and Migliaro were responding to the order of a superior officer, Sergeant Mendez, to seize Anthony and remove her to the hospital. "Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances)." Bilida v. McCleod, 211 F.3d 166, 174-75 (1st Cir. 2000); cf. Varrone v. Bilotti, 123 F.3d 75, 81 (2d Cir.1997) (holding that subordinate officers who carried out "the apparently valid order" of a superior officer were entitled "to hav[e] the same qualified immunity that the [superior officer] had"); Diamondstone v. Macaluso, 148 F.3d 113, 126 (2d Cir.1998) (holding that an officer was not entitled to qualified immunity for his reliance on the advice of his superiors because that advice was not plausibly valid). Sergeant Mendez's order to seize Anthony was an apparently valid order in light of the substance of the 911 call and all of the surrounding circumstances known to Officers Collegio and Migliaro. Officers Collegio and Migliaro therefore reasonably could have concluded, given Sergeant Mendez's order, that probable cause existed to seize Anthony. They are thus entitled to qualified immunity from Anthony's § 1983 claim against them in their individual capacities based on the warrantless seizure.[5]
 
 
 34
 2. Anthony's § 1983 Claim Against the City of New York and the Officers in their Official Capacities
 
 
 35
 Anthony next asserts § 1983 claims against the City of New York and the named and "John Doe" police officers in their official capacities based on the allegedly unconstitutional warrantless seizure. Assuming, arguendo, that the warrantless seizure and involuntary hospitalization did violate the Constitution, the City and the officers sued in their official capacities are liable under § 1983 only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is conducted "pursuant to governmental `custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Anthony claims that there is a "custom or policy of arresting and restraining disabled persons regardless of their need for assistance." Appellants' Brief at 33. The existence of an official policy of seizing and hospitalizing disabled persons, Anthony argues, is shown here in two ways: first, through the actions of Sergeant Mendez, as an individual with final decision-making authority; and second, through a City policy of inadequate training or supervision.
 
 
 36
 Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim. See Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The individual must "be responsible for establishing final government policy" in order for municipal liability to attach. Id. at 483, 106 S.Ct. 1292. Anthony argues that Sergeant Mendez was such an individual, and that his order to Officers Collegio and Migliaro to seize and hospitalize her thereby constituted a municipal policy of arbitrarily committing non-violent disabled individuals.
 
 
 37
 In applying the Pembaur standard, we have explained that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." Rookard v. Health & Hosps. Corp., 710 F.2d 41, 45 (2d Cir.1983) (footnote and internal citation omitted). Thus, in Rookard, we held that the Executive Director of Harlem Hospital and the Vice President for Corporate Affairs at HHC (which ran Harlem Hospital) were final decision-makers with respect to personnel decisions at the hospital, because their "authority over personnel decisions was final." Id. Similarly, in Jeffes v. Barnes, 208 F.3d 49 (2d Cir.2000), we found, based on an analysis of a sheriff's authority under state law, that an elected sheriff in charge of the county jail had final authority over personnel decisions at the jail. Id. at 60-61.
 
 
 38
 Anthony likens Sergeant Mendez to the county sheriff in Jeffes, arguing that Sergeant Mendez had decision-making authority over the conduct of the officers at the scene. We think, however, that an elected county sheriff has significantly more responsibility in creating official policy than does a police sergeant in the NYPD. Anthony does not provide any analogue to the state-law authority that a county sheriff possesses, and instead argues only that Sergeant Mendez is a final decision-maker because he had discretion to determine how to handle the particular situation at Wright's apartment. But in Jeffes, we explicitly rejected the view that mere exercise of discretion was sufficient to establish municipal liability. See id. at 57 ("It does not suffice for these purposes that the official has been granted discretion in the performance of his duties." (citing St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988))). We accordingly reject Anthony's argument that Sergeant Mendez's order constitutes an official municipal policy.
 
 
 39
 The existence of an official municipal policy or custom can also be demonstrated by establishing a deliberate government policy of failing to train or supervise its officers. See City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Municipal liability attaches "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388, 109 S.Ct. 1197.
 
 
 40
 This standard is not met in the instant case because Anthony has not shown that there exists a deliberate City policy of failing to train its police officers in how to interact with non-violent disabled individuals. Anthony argues only that "[i]t is apparent from the actions of the officers and the testimony of Migliaro that there was no special training in place regarding the treatment of non-violent disabled persons." Appellants' Brief at 34. To the contrary, when asked about his training, Officer Migliaro expressly stated that the NYPD did have a training policy in place to instruct officers in how to interact with what the NYPD terms "emotionally disturbed persons" ("EDPs"), and that the policy distinguished between EDP emergencies involving someone who was violent or dangerous and EDP emergencies involving someone who was not violent or dangerous. [JA 213-16] We thus reject Anthony's argument that an official policy can be established using a failure to train theory, because the evidence made available through discovery shows that the City did have training procedures in place to assist its officers in interacting with non-violent disabled individuals.[6]
 
 
 41
 Because Anthony has not shown that there is an official policy or custom of arbitrarily seizing and hospitalizing disabled individuals, we reject her § 1983 claims for damages against the City and against the named and unnamed police officers in their official capacities.
 
 
 42
 C. Anthony's ADA Claim Against the City of New York
 
 
 43
 In addition to her § 1983 claims based on the warrantless entry and warrantless seizure, Anthony also claims that she is entitled to damages from the City of New York pursuant to Title II of the ADA.[7] Anthony argues that in seizing and involuntarily hospitalizing her, the City intentionally discriminated against her on the basis of her disability.
 
 
 44
 Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. If, as Anthony claims, the seizure and hospitalization were motivated by the officers' discrimination against individuals with disabilities, she would presumably have a claim that she was "subjected to discrimination" by a public entity in violation of Title II.[8]
 
 
 45
 There is no evidence, however, that the seizure and hospitalization were motivated by discrimination against individuals with disabilities. Anthony has alleged no facts showing that Sergeant Mendez, who ordered Officers Collegio and Migliaro to seize Anthony, acted with discriminatory intent. Anthony notes only that "[t]he officers admitted that they perceived [Anthony] as disabled, and that they arrested her simply because they thought there was something wrong with her." Appellants' Brief at 40. This is apparently a reference to Officer Migliaro's comment in his deposition testimony that Anthony "seemed to be needing of assistance because she appeared to be slow."[9] [JA 191] However one might interpret Officer Migliaro's comment, it is not enough, standing alone, to establish sufficient facts to defeat summary judgment on the claim that discriminatory intent was a motivating factor in Sergeant Mendez's decision to order Officers Collegio and Migliaro to seize Anthony. We therefore affirm the district court's grant of summary judgment against Anthony on her ADA claim against the City of New York.[10]
 
 
 46
 III. Anthony's and Wright's Claims Stemming from the Events at Kings County Hospital
 
 A. Anthony's § 1983 Claim Against HHC
 
 47
 It is undisputed that after being transported by Officers Collegio and Migliaro to Kings County Hospital, Anthony was confined there overnight. During this confinement, the hospital took blood and urine samples, and forcibly administered drug tests and anti-psychotic medication. Anthony alleges that these actions violated her Fourth Amendment right to be free from unreasonable searches and seizures and her Fourteenth Amendment substantive due process right to bodily integrity [Blue 36], and she brings a § 1983 claim against HHC based on these alleged constitutional violations.
 
 
 48
 The parties do not dispute that Anthony was seized while she was confined at Kings County Hospital, and it is established that blood and urine tests constitute searches under the Fourth Amendment. Schmerber v. California, 384 U.S. 757, 767-68, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood); Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (urine). Anthony's confinement at Kings County Hospital was not unconstitutional, however, because the hospital staff had reasonable grounds to believe that she was a danger to herself or to others. See Glass, 984 F.2d at 58. The records from Anthony's examinations by hospital staff demonstrate that they found her initially "unresponsive," and subsequently "delusional" and "paranoid." [JA 89-96, 105, 107-08] Although the hospital staff also correctly diagnosed Anthony with Down Syndrome and hearing difficulty, these diagnoses did not necessarily explain the other evidence of delusional and paranoid behavior.
 
 
 49
 Nor did the blood and urine tests conducted by hospital staff violate the Fourth Amendment. The Fourth Amendment "does not proscribe all searches and seizures, but only those that are unreasonable." Skinner, 489 U.S. at 619, 109 S.Ct. 1402. The Supreme Court has held that warrantless blood and urine tests for the purpose of detecting drug use are reasonable and therefore constitutionally permissible when justified by "special needs" beyond a generalized law enforcement purpose. Id. at 619-20, 109 S.Ct. 1402; see also Ferguson v. City of Charleston, 532 U.S. 67, 76-80, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (affirming the special needs doctrine, and holding that warrantless drug tests conducted on hospital patients solely for a law enforcement purpose were unconstitutional because they fell outside the special needs doctrine). Here, the blood and urine tests were not conducted for any law enforcement purpose, but rather were undertaken to facilitate Anthony's diagnosis and treatment by ruling out drug use or other physiological conditions as a possible explanation for her delusional behavior. The tests were therefore constitutionally permissible. Cf. Skinner, 489 U.S. at 619-20, 623-24, 109 S.Ct. 1402.
 
 
 50
 Finally, HHC's confinement and involuntary medication of Anthony did not violate her Fourteenth Amendment substantive due process rights. "As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995). As just noted, HHC staff reasonably believed that Anthony was a danger to herself or to others, and the involuntary hospitalization was therefore constitutional under the Fourteenth Amendment.
 
 
 51
 As none of the events that occurred at Kings County Hospital violated Anthony's constitutional rights, we affirm the district court's grant of summary judgment against Anthony on her § 1983 claim against HHC.
 
 B. Wright's Familial Association Claim
 
 52
 Wright alleges that Anthony's confinement overnight at Kings County Hospital unconstitutionally interfered with her substantive due process right of familial association. We have held that family members have, "in general terms, a substantive right under the Due Process Clause `to remain together without the coercive interference of the awesome power of the state.'" Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir.1999) (quoting Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977)). In order to prevail on her claim, Wright must demonstrate that her separation from Anthony[11] was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." Id.
 
 
 53
 We agree with the district court that Anthony's temporary separation from Wright, while undoubtedly difficult and upsetting for both women, was not so "shocking, arbitrary, and egregious" as to violate Wright's substantive due process rights. See Anthony, 2001 WL 741743, at *12. The police officers undertook numerous attempts to contact Wright before transporting Anthony to the hospital; Anthony and Wright were ultimately separated only for a short time; and the hospital staff accommodated Wright's interest in staying with Anthony by allowing Wright to spend the night in Anthony's hospital room. See Tenenbaum, 193 F.3d at 600-01 (holding that parents' right to familial association was not violated when the state removed their daughter from school for several hours to determine whether she had been sexually abused, and stressing that the short separation at issue did not violate substantive due process because it did not "result in [the plaintiffs'] wholesale relinquishment of their right to rear" their daughter (quoting Joyner v. Dumpson, 712 F.2d 770, 778 (2d Cir.1983)) (internal quotation marks omitted)). We thus affirm the district court's grant of summary judgment against Wright on her familial association claim.
 
 CONCLUSION
 
 54
 For the foregoing reasons, we affirm the judgment of the district court granting defendants' motions for summary judgment as to all of plaintiffs' claims.
 
 
 
 Notes:
 
 
 [1]
 An on-line resource from the National Association for Down Syndrome describes the causes and incidence of Down Syndrome as follows:
 Down syndrome is a genetic condition that causes delays in physical and intellectual development. It occurs in approximately one in every 800 live births. Individuals with Down syndrome have 47 chromosomes instead of the usual 46. It is the most frequently occurring chromosomal disorder. Down syndrome is not related to race, nationality, religion or socioeconomic status. The most important fact to know about individuals with Down syndrome is that they are more like others than they are different.
 National Association for Down Syndrome, Down Syndrome Facts, at http://www.nads.org/pages/facts.htm (last visited June 9, 2003). An on-line resource from the National Down Syndrome Society characterizes the abilities of individuals with Down Syndrome as follows:
 Individuals with Down syndrome are becoming increasingly integrated into society and community organizations, such as school, health care systems, work forces and social and recreational activities. Individuals with Down syndrome possess varying degrees of mental retardation, from very mild to severe. Most people with Down syndrome have IQs in the mild to moderate range of mental retardation.
 National Down Syndrome Society, Questions and Answers About Down Syndrome, at http://www.ndss.org/content.cfm?fuseaction=InfoResGeneralArticle & article=194 (last visited June 9, 2003).
 
 
 [2]
 The SPRINT report contains both the calling number and the exact address, including the apartment number, from which the phone call was placed, and thus made clear that the call came from the specific apartment the officers entered. [JA 336]
 
 
 [3]
 Plaintiffs never argued before the district court that Officers Collegio and Migliaro did not actually have knowledge of the contents of the 911 call. Plaintiffs' briefs on appeal, however, could be read to make the argument that Officers Collegio and Migliaro did not, in fact, know the contents of the call. That argument must be deemed waived, as it was never raised before the district courtSee Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 418 (2d Cir.2001) (noting that in general, we will not consider an argument raised for the first time on appeal). Even were we to find that this argument was not waived, we would reject it on its merits. Plaintiffs conceded that Officers Collegio and Migliaro both thought that they were responding to a 911 call about a man with a gun. [ROA Document 14, at 3] This concession is supported by additional facts in the record demonstrating that Officers Collegio and Migliaro knew the substance of the call — Officer Migliaro testified that he was responding to a call about "a person in need of assistance" [JA 178], and Officer Collegio noted the 911 dispatcher's transmission in his log book as an "EDP call" (a call from an "emotionally disturbed person"). [JA 356] These facts provide unrefuted evidence that Officers Migliaro and Collegio believed they were responding to a 911 call from a person who was in immediate danger or in urgent need of assistance.
 Because the record before us shows that Officers Collegio and Migliaro knew the substance of the 911 call when they responded to Wright's apartment, this case does not raise any issues regarding the scope of the "collective knowledge" doctrine, and we need not consider whether the warrantless entry would have been justified by exigent circumstances if the information provided to the 911 operator was never transmitted either to the police dispatcher or to the officers on the scene. Cf. United States v. Colon, 250 F.3d 130, 138 (2d Cir.2001).
 
 
 [4]
 Because we conclude that the warrantless entry was justified by exigent circumstances, we need not reach defendants' alternative argument that the warrantless entry was justified by Anthony's consent
 
 
 [5]
 Anthony argues that Officers Collegio and Migliaro waived the defense of qualified immunity by failing to assert that defense in their answer before the district courtSee Appellants' Brief at 30. Officers Collegio and Migliaro first raised the defense in their motion for summary judgment, which the district court implicitly construed as a motion to amend the answer. Although affirmative defenses like qualified immunity must be pleaded in response to a pleading, see Fed.R.Civ.P. 8(c), the district court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed.R.Civ.P. 15(a) for leave to amend the defendant's answer. See Monahan v. N.Y. City Dep't of Corr., 214 F.3d 275, 283 (2d Cir.2000) (holding, in the context of the affirmative defense of res judicata, that "the district court has the discretion to entertain the defense when it is raised in a motion for summary judgment, by construing the motion as one to amend the defendant's answer"). Rule 15(a) provides that leave to amend "shall be freely given when justice so requires," and we have interpreted this instruction in favor of allowing the amendment absent a showing by the non-moving party of bad faith or undue prejudice. See State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981). Because there was no showing of bad faith or undue prejudice, the district court did not abuse its discretion in construing defendants' motion for summary judgment as a motion to amend their answer to assert a qualified immunity defense. The defense of qualified immunity therefore was not waived below.
 
 
 [6]
 Even if we agreed with Anthony that Officer Migliaro's conduct does indicate that he personally was untrained in this area, this type of showing is not sufficient to establish a deliberate failure to train policySee Harris, 489 U.S. at 390-91, 109 S.Ct. 1197 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered." (internal citations omitted)).
 
 
 [7]
 Anthony's brief to this Court could be read to assert an ADA claim against both HHC and the City of New YorkSee Appellants' Brief at 37. Anthony's ADA claim against HHC was voluntarily dismissed with prejudice below, however, and thus cannot be asserted on appeal.
 
 
 [8]
 The parties do not dispute that Anthony is a disabled individual within the meaning of the ADA,see 42 U.S.C. § 12102(2), nor do they dispute that the City of New York is a public entity.
 
 
 [9]
 Asked to explain what "appeared to be slow" meant, Officer Migliaro replied: "[I]t appeared she had, I don't know the best way to say this, she had mental deficiencies. I'm not a physician, but that's what I could tell." [JA 193]
 
 
 [10]
 In arguing that the district court correctly granted summary judgment against Anthony on her ADA claim, the City of New York notes that the Fourth Circuit appears to have held that if police conduct is objectively reasonable and thus constitutional under the Fourth Amendment, it cannot be found to be subjectively discriminatory in violation of the ADASee Appellees' Brief at 53-54 (citing Bates ex rel. Johns v. Chesterfield County, 216 F.3d 367, 373 (4th Cir.2000)). Although we do not necessarily agree with this reading of the Fourth Circuit's opinion in Bates, we need not reach this issue here for two reasons. First, we reserved judgment on the question whether the warrantless seizure of Anthony was a Fourth Amendment violation, and so we have not decided whether it was objectively reasonable for Officers Collegio and Migliaro to believe that Anthony was in danger of harming herself or others. See infra Section II.B.1. Second, regardless of whether the officers' conduct was objectively reasonable, our conclusion that there is no evidence of discriminatory intent moots the question whether conduct that is objectively reasonable under the Fourth Amendment, but that is subjectively motivated by discriminatory intent, may violate the ADA.
 
 
 [11]
 We assume without deciding that Wright has a substantive due process right to familial association with Anthony, her half-sister and ward