24/7 RECORDS, INC., Plaintiff–
Appellant,

v.

SONY MUSIC ENTERTAINMENT, INC. and Sheridan Square Entertainment, LLC, doing business as Artemis Records, Defendants–Appellees.

No. 04–5563–CV.

United States Court of Appeals,
Second Circuit.

Argued: July 15, 2005.

Decided: Nov. 8, 2005.

and underpayments. 24/7 further alleges that Sony Music Entertainment, Inc. ("Sony"), whose affiliate distributed the original Ketchup Song, pressured Artemis to cancel distribution of the song and to terminate the Agreement, and thereby tortiously interfered with the Agreement and violated New York's unfair competition laws (Artemis and Sony are referenced collectively as "Appellees").

24/7 appeals from a judgment entered on September 20, 2004 by the United States District Court for the Southern District of New York (Cedarbaum, *J.*), dismissing the complaint on Appellees' motion for summary judgment. We affirm in part, and reverse in part.

Robert W. Cinque, Cinque & Cinque, P.C., New York, N.Y. (James P. Cinque, on the brief), for Appellants.

Gregory A. Clarick, Manatt, Phelps & Phillips, LLP (Steven M. Hayes, on the brief), for Appellees.

Before: JACOBS and B.D. PARKER, Circuit Judges, and GLEESON, District Judge.[*]

JACOBS, Circuit Judge.

This dispute arises out of a record distribution agreement (the "Agreement") between producer 24/7 Records, Inc. ("24/7") and distributor Sheridan Square Entertainment, LLC d/b/a Artemis Records ("Artemis"). The dispute was sparked by 24/7's production of a cover version of "The Ketchup Song (Heh Hah)."

24/7 alleges that Artemis breached its obligation to distribute the Ketchup Song, wrongfully terminated the Agreement, and (among other things) made overcharges

## BACKGROUND

24/7, an independent Florida-based record label, entered into a distribution agreement with Artemis, making Artemis the "sole and exclusive" distributor of all 24/7 recordings released in the United States for an initial term of three years. The Agreement contemplated that RED Distribution, Inc. ("RED"), a Sony subsidiary, would perform certain distribution tasks on Artemis's behalf. As of November 2002, there were eleven 24/7 records in distribution (with other recordings in preparation), including the Ketchup Song.

Earlier in 2002, a group called "Las Ketchup" recorded "The Ketchup Song (Heh Hah)." That recording was distributed by a Sony affiliate, Columbia Records. The Ketchup Song became a success overseas, and soon after, 24/7 recorded a cover performed by a group called "The Hines Girls." Distribution of 24/7's Ketchup Song began at the latest on November 5, 2002, with a CD jacket

[*] The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by designation.

featuring a ketchup bottle with a label arguably suggestive of the Heinz ketchup label.

Shortly after 24/7's Ketchup Song was released, Artemis halted distribution, claiming (in a November 7, 2002 letter from Artemis's Executive Vice President of Business and Legal Affairs Adrian White to 24/7's CEO Lou Pace) that continued distribution of the song "might infringe rights owned by the distributor" of the Las Ketchup version, and might trigger a trademark dispute with H.J. Heinz Co. 24/7 alleges that those reasons were pretextual; that the true reason Artemis pulled the plug on the Ketchup Song was corporate pressure by Sony, which wanted no competition for the original Las Ketchup recording; and that Artemis pulled the plug on the *entire distribution agreement* for the same reason, a move that allegedly led to 24/7's demise. Artemis claims that the Agreement was never terminated.

The complaint in this action alleges that Artemis breached the Agreement by: [i] failing to fulfill its contractual obligation to distribute 24/7's Ketchup Song single (the "Ketchup Song claim"); [ii] wrongfully terminating the Agreement (the "termination claim"); and [iii] among other things, failing to pay 24/7 royalties and wrongfully charging or overcharging 24/7 (the "miscellaneous claims").[1] The complaint also alleges that Sony pressured Artemis to cancel the distribution of the Ketchup Song single and to terminate the Agreement, thereby tortiously interfering with the Agreement and violating New York's unfair competition laws. Artemis and

Sony moved for summary judgment, arguing principally that [i] cancellation of the distribution of the Ketchup Song was justified by concerns over potential copyright and trademark liability; [ii] that Sony did not induce Artemis into cancelling distribution of the Ketchup Song; and that [iii] Artemis never terminated the Agreement. The district court granted Appellees' motion for summary judgment, and dismissed the complaint.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*, reviewing the evidence in the light most favorable to 24/7. *See Anthony v. City of New York*, 339 F.3d 129, 134 (2d Cir.2003). Summary judgment is proper if "there is no genuine issue as to any material fact" and Appellees are "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### I. Breach of Contract

#### a. *The Ketchup Song*

■ 24/7 claims that Artemis breached the Agreement by failing to distribute 24/7's Ketchup Song. The district court held that, regardless of Artemis's actual motivations for halting distribution, 24/7 failed to obtain a copyright license from Sony for use of the song;[2] that a copyright license was a condition on distribution by Artemis; and that 24/7 therefore cannot assert that Artemis breached any obligation to distribute that work. We agree.

The Agreement is governed by New York law, under which, 24/7 must prove

---

1. While we refer to the allegations concerning the Ketchup Song, the termination of the Agreement, and the miscellaneous breaches of the Agreement as "claims," we note that 24/7's complaint specified these individual breaches as part of a single omnibus breach-of-contract claim.

2. While it is not clear from the record who owned the Ketchup Song copyright, it is undisputed that a Sony affiliate, Sony/ATV Publishing LLC, published the song, and Sony/ATV is the sole entity claimed by either party as having authority to grant or deny a license.

the following to make out a claim for breach of the Agreement: [i] the existence of a contract; [ii] *the adequate performance of the contract by 24/7;* [iii] the breach of the contract by Artemis; and [iv] damages. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 177 (2d Cir.2004). 24/7 cannot establish that its own performance was adequate. *See Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.,* 61 N.Y.2d 106, 113, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (1984) ("[A] contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned.").

Section 4.01 of the Agreement states:

[24/7] *solely shall be responsible for,* and shall pay all costs in connection with, each of the following:

\*   \*   \*   \*   \*   \*

(b) *The securing, in writing, of all necessary licenses,* consents and permissions *required for the distribution of Records hereunder,* including, without limitation, from recording artists, producers, other performers, music publishers, unions and guilds, and other Persons rendering services or granting rights in connection with the Recordings and the Records.

(emphasis added). In section 10.01, 24/7 "represent[s] and warrant[s]" that it either has,

*or prior to release hereunder shall have,* and shall at all times thereafter continue to have in effect a valid and enforceable grant of rights or *license* ... *with respect to each Recording, each musical composition and all other copyrightable materials embodied in or on the Records* (including, without limitation, mechanical licenses for all musical compositions and licenses for so-called "samples").

(emphasis added). This representation required 24/7 to obtain a license for use of the Ketchup Song, which 24/7 failed to do, before Artemis became obligated to distribute that record.

In order to comply with the Artemis contract and to avoid copyright infringement for the Ketchup Song cover, 24/7 was required to obtain either a negotiated license (which Sony was free to grant or deny) or a compulsory license, which would allow 24/7 to cover the Ketchup Song without Sony's consent so long as it notified Sony of its intent to do so and complied with such statutory requirements as the payment of royalties at a fixed statutory rate. *See* 17 U.S.C. §§ 106, 115. *See generally Cherry River Music Co. v. Simitar Entm't, Inc.,* 38 F.Supp.2d 310, 311–12 (S.D.N.Y.1999) (describing licensing scheme); 2–8 Nimmer on Copyright § 8.04 (same).

On appeal, 24/7 does not claim that a negotiated license for use of the Ketchup Song was (expressly) granted by Sony. Moreover, as the district court noted, 24/7 made two unsuccessful attempts to negotiate a license with Sony after distribution of the Ketchup Song was cancelled—on November 14 and 26.

As to compulsory licensing under copyright law, 17 U.S.C. § 115(b)(1) provides:

Any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner.

17 U.S.C. § 115(b)(1). That time-limit is strictly enforced:

Failure to serve or file the notice required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorec-

ords actionable as acts of infringement
. . . .

*Id.* § 115(b)(2). It is undisputed that distribution of the Ketchup Song started, at the latest, on November 5, 2002, and that 24/7 mailed a notice of intent to obtain a compulsory license to Sony on November 7, 2002—at least two days after distribution began. (This notice was received by Sony on November 8, 2002.) 24/7 therefore had no negotiated license to use the Ketchup Song and had "foreclos[ed] the possibility" of obtaining a compulsory license.

On appeal, 24/7 claims that it obtained an implied negotiated license from Sony, pointing to various actions and omissions by Sony in late 2002 and early 2003. We decline to consider the argument because it was not presented to the district court in the first instance. *See Gwozdzinsky v. Magten Asset Mgmt. Corp.*, 106 F.3d 469, 472 (2d Cir.1997) ("[A]bsent manifest injustice or a showing of extraordinary need, we will not decide an issue on appeal not first presented to the district court.").[3]

Finally, 24/7 argues that Artemis failed to provide 24/7 with notice and an opportunity to cure its failure to secure a license for the Ketchup Song, as required by section 14.03 of the Agreement. In rejecting this argument, the district court observed that 24/7 could not have procured a compulsory license, that its two attempts to obtain an express negotiated license were fruitless, and that "Artemis was not required to give 24/7 time to cure the license defect before ceasing distribution, because any such attempt to cure would have been futile." 24/7's affirmative argument that

the copyright holder—Sony—was implacably opposed to 24/7's use of the song lends force to the district court's reasoning. In any event, 24/7 does not address that argument on appeal (except, perhaps, through the argument that it obtained an implied license for the Ketchup Song, an argument which itself is waived). *State Street Bank v. Inversiones Errazuriz*, 374 F.3d 158, 172 (2d Cir.2004) ("When a party fails adequately to present arguments in an appellant's brief, we consider those arguments abandoned."). 24/7 has therefore abandoned any objection based on the notice-and-cure provision.[4]

### b. *Termination of the Agreement*

■ Apart from the claimed breach concerning the Ketchup Song dispute, 24/7 claims that Artemis breached the Agreement by terminating it altogether. Artemis responds that it "never terminated the Distribution Agreement and never ceased distributing [24/7's] records." The district court made no mention of this contract dispute in its opinion, and simply dismissed it after disposing of the Ketchup Song claim. This was error.

First, the November 7, 2002 letter from Artemis's White to 24/7's Pace concerning distribution of the Ketchup Song went on to give notice that

> effective immediately, *[Artemis] requires the office space it has previously made available to you for use by your employee Donny Novakovic.* I understand from Ken Walsh, [Artemis's] CFO, that you have informed Mr. Novakovic

---

**3.** It is not contended on appeal that Artemis waived the requirement that 24/7 obtain a license prior to distribution of the Ketchup Song.

**4.** Because 24/7's failure to secure a license for use of the Ketchup Song is dispositive, we need not consider [i] whether the district

court properly concluded that the failure to secure a license would independently render any obligation to distribute unenforceable as part of "a bargain to commit an illegal act"; or [ii] the merit of Artemis's trademark-based objections to distribution of the Ketchup Song.

that he was to vacate the premises by the end of business November 6, 2002.

Finally, I am writing to confirm that since we cannot agree on a renegotiated distribution rate; and since on several occasions you have, for whatever reason, refused to pay third party vendors moneys owed, placing [Artemis] in an uncomfortable and untenable position, *[Artemis] agrees that it would be best to terminate this relationship immediately.* I understand you have been seeking a new distributor but we have not yet been advised by you of your alternate distribution agreements. Our first preference, as we have previously advised you, is for you to obtain a new distributor who will accept pending returns. Such an arrangement would allow us to settle our accounts promptly after we are notified of who your new distributor is.

*In the meantime, however, [Artemis] will shortly be sending to retail outlets a notice advising them that Artemis will not be distributing further product* or, after the period six months from the date of such notice, accepting returns. During this period [Artemis] will continue to account to you monthly, paying any monies due you or, concomitantly, expecting prompt payment of any monies due [Artemis.] After this process has concluded (unless in the meantime you secure distribution) *[Artemis] will render a final accounting* at which time [Artemis] will expect final payment of any monies it may be due; or if applicable, [Artemis] will pay you any final monies due you.

(emphasis added). This letter came on the heels of various Artemis e-mails indicating that Artemis was preparing to terminate the Agreement. For instance, a November 6 e-mail from Walsh to Jeff Brody, an associate at Artemis, stated:

I understand that Dean Tabaac may be the person who sends out letters to the accounts to tell them we are no longer distributing a label. Can you get with him and let me know how much notice, if any, we need to give retail before we send a letter saying we are no longer distributing? Obviously, *24/7 does not yet have a new distributor and may not get one but we'll want to send the letter out asap.*

(emphasis added). A November 7, 2002 e-mail from Shannon McSweeney, Director of Marketing Services at Artemis, warned Artemis personnel, including Walsh, as follows:

Please be aware that effective immediately 24/7 is no longer part of the Artemis account. From this date forward we should not incur any 24/7 charges. If you wish, you may establish a seperate [sic] account with them, but Artemis will not be involved with that account or decision.

The declaration of Lou Pace, 24/7's CEO, confirms that "all business contact between [24/7, Artemis, and RED] came to a complete halt" after November 7, 2002—the date of White's letter—and that sales figures show that Artemis's was no longer distributing its records, a point Pace demonstrated by parsing Artemis' statement of account for 24/7's records in the period January 2002 to May 2003:

As can be seen, net billings for October 2002 were $12,559.49 and $13,115.86 for November. In December 2002, the first month following Artemis's announced termination, net billings spiked radically downward to a negative $38,794.22. The reason for this is that RED sold to the retailers on a full return basis, and thus during the month of December, returns from retailers back to Artemis aggregated $41,702.27 versus sales by Artemis of $2,908.05.

In addition, Pace confirmed that following the November 7 letter from White, Artemis evicted 24/7's head of promotion, Danny Novakovic, from his office at Artemis and that:

> [t]here was no discussion about marketing plans, future releases, distribution of the 24/7 records or any of the many other topics which [Pace and Artemis representatives] regularly discussed on a day to day basis prior to the termination of the Distribution Agreement. Subsequent to November 8th, 24/7 was not allowed to submit any new artists or product to Artemis for distribution.[5]

Artemis cites the deposition testimony of several Artemis employees to support its contention that it never terminated the Agreement and never stopped distributing 24/7's records.[6] However, 24/7 produced evidence from which a jury could find that the Agreement was terminated. *Anthony,* 339 F.3d at 134 (on summary judgment, factual inferences are drawn in *non-moving party's* favor, and motion must be denied if there exists a genuine issue as to any material fact). Otherwise, Artemis advances no reason, based either on the terms of the Agreement or some principle of New York contract law, why the termination of the Agreement—if it occurred— was warranted.

#### c. *Miscellaneous Claims*

■ The complaint identified seven additional ways in which Artemis "materially breached the Distribution Agreement":

(a) failing to pay royalties due 24/7 pursuant to the Distribution Agreement;

(b) deliberately inflating the amount of returns by purchasers of 24/7 product and wrongfully charging these returns against the 24/7 account;

(c) holding excessive reserves purportedly needed to cover those returns;

(d) refusing to distribute and sell 24/7 recordings with the level of diligence, care and skill and in breach of the covenant of good faith and fair dealing implied by the terms of the Distribution Agreement;

(e) purporting to incur expenses and charges for which 24/7 was not responsible under the Distribution Agreement and then holding 24/7 liable therefor;

(f) wrongfully retaining the irrevocable letter of credit in the sum of $100,000.00 issued by 24/7 in favor of Artemis pursuant to the Distribution Agreement;

(g) improperly purporting to charge 24/7 for promotional expenses which were no[t] actually incurred or for which 24/7 was not liable under the terms of the Distribution Agreement . . . .

As with the termination claim, the district court summarily dismissed these miscellaneous claims after dealing with the Ketchup Song. On appeal, Artemis claims that, in any event, 24/7 failed to produce any evidence to support these claims. We agree with Artemis that 24/7 produced insufficient evidence as to these claims, but we reverse nevertheless.

---

**5.** As noted in Part II of this Opinion, the record shows that on or about November 6, 2002, Artemis's executives were—at the very least—interested in terminating the Agreement. *See infra.*

**6.** We reject Artemis's (conclusory) argument that Pace's declaration is not cognizable because the assertions made therein are "conclusory" or "speculative." *See Conroy v. N.Y.*

*State Dep't of Corr. Servs.,* 333 F.3d 88, 94 (2d Cir.2003) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." (citation omitted)). As 24/7's CEO, Pace could testify as to the business relationship between 24/7 and Artemis and the drop-off in sales following the alleged termination of the Agreement.

In its Rule 56.1 Statement of Undisputed Facts, Artemis as movant adduced no facts relating to the miscellaneous claims. However, Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York concerns only the "material facts as to which the moving party contends there is no genuine issue to be tried." "A court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir.2001), although "it may in its discretion" do so. *Id.* Since the district court did not mention the miscellaneous claims, we have no way of knowing whether it would have looked past Artemis's failure to put issues of fact relating to these claims into play and whether Artemis otherwise satisfied its moving burden to show—"that is, point[ ] out to the district court—that there [was] an absence of evidence to support" these claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). But if (as it seems) Artemis failed to discharge this burden, "summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir.2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quotation omitted)).

We therefore reverse the grant of summary judgment as to the miscellaneous claims, without prejudice to further motion practice.

### d. *Waiver*

Appellees' chief argument as to the termination and miscellaneous claims is that, even if 24/7 could prevail on the merits, 24/7 waived its claims by failing to present them to the district court in the first instance. *See Gwozdzinsky v. Magten Asset Mgmt. Corp.*, 106 F.3d 469, 472 (2d Cir. 1997) ("[A]bsent manifest injustice or a showing of extraordinary need, we will not decide an issue on appeal not first presented to the district court."). Specifically, Appellees contend that in the district court, 24/7 did not present these claims as distinct claims that would survive regardless of the court's resolution of the Ketchup Song claim. Whether or not Appellees' characterization is apt, *we* observe that even though the district court clearly overlooked the termination and miscellaneous claims in making its decision, 24/7 did not move the district court to reconsider that decision.

Although it may be that 24/7's failure to move for reconsideration was designed to achieve, in effect, what otherwise would have been an unjustified interlocutory appeal of the dismissal of the Ketchup Song claim, we address the termination and miscellaneous claims on appeal. *See Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir.2001) ("[W]e have broad discretion to consider issues not raised in the District Court."). Among other reasons, in this case the district court did not reach certain of 24/7's claims at all, and the record presents a clear basis upon which to reverse the grant of summary judgment as to those claims. *See, e.g., Singleton*, 428 U.S. at 121, 96 S.Ct. 2868 ("Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt."); *Booking*, 254 F.3d at 419 (exercising discretion to

address issue where, inter alia, "substantial injustice" would otherwise result; that is, plaintiff's recovery turned on issue that district court declined to address).

## II. Tortious Interference and Unfair Competition

■ 24/7 claims that Sony induced Artemis to cease distribution of 24/7's Ketchup Song and to terminate the Agreement, thus tortiously interfering with the Agreement and violating New York's unfair competition laws. The district court dismissed these claims based on its dismissal of 24/7's breach-of-contract claims. The court reasoned (and 24/7 does not dispute) that absent proof of an underlying breach of contract, a plaintiff cannot prove tortious interference, *see Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956); *Giannelli v. St. Vincent's Hospital & Med. Ctr.*, 160 A.D.2d 227, 553 N.Y.S.2d 677, 681 (1990), or unfair competition, *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 75 (2d Cir.1988). However, while the district court properly dismissed the claim that Artemis breached the Agreement by failing to distribute the Ketchup Song, it erred—as previously discussed—in dismissing 24/7's claim that Artemis wrongfully terminated the Agreement. *See supra.* Therefore, the question is whether 24/7 has produced sufficient evidence that Sony induced *that* breach. *See Israel*, 1 N.Y.2d at 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (tortious interference claim requires proof that the defendant intentionally procured the breach of contract); *Giannelli*, 553 N.Y.S.2d at 681 (same); *Volvo*, 857 F.2d at 75 (unfair competition claim requires proof that conduct of the defendant proximately caused the misappropriation of property of or benefit to the plaintiff). Reviewing the evidence in the light most favorable to 24/7, the answer is yes.

24/7 claims that even though Artemis and Sony have no formal business relationship, Sony dominates Artemis economically. There is evidence tending to support this assertion. Artemis's CEO, Danny Goldberg, testified at his deposition that in 2002—when Artemis allegedly terminated the Agreement—Sony was considering investing in Artemis (although by 2003 it became clear that was not going to happen). So, although Goldberg would never "want to do anything that violated [Artemis's] legal obligation," he would rather "not have an unhappy Sony." Moreover, the firm that handled at least some distribution for Artemis under the terms of the Agreement (RED) is a wholly-owned subsidiary of Sony.

An available inference is that Goldberg was open to suggestions when, on November 6, 2002, "several Sony executives" called Goldberg to express their displeasure over the release of 24/7's Ketchup Song. For instance, Goldberg recalled a profanity-laced conversation with Don Ienner, the then-President of Sony-affiliate Columbia Records, who said he was "unhappy," "aggravated," and "grumpy" about the release of 24/7's Ketchup Song single, and that he did not "like the idea that there was another Ketchup Song coming out. He was hoping that [Artemis] could withdraw it." Goldberg undertook to "see if there is a basis on which [Artemis] can withdraw it." Ienner had a similar conversation with Ken Antonelli of RED.

After these conversations, Goldberg informed Artemis CFO Ken Walsh that there "was an issue" with the Ketchup Song, and instructed Walsh to speak with Adrian White, Artemis's Executive Vice President of Business and Legal Affairs. According to Walsh, Goldberg said he could not "believe we are still in this relationship. I want to get out of this relation-

ship." Walsh communicated Goldberg's view to White, noting that "Danny wants to sever this relationship, doesn't understand why we are still involved, and he wants you to look at the agreement." According to White, Walsh stated that "Sony was upset about 'The Ketchup Song' and Danny [Goldberg] wanted to get out of the 24/7 relationship."

For his part, Pace of 24/7 avers that Walsh contacted him on November 6 and told him:

> not only was the Ketchup Song being pulled but my entire distribution deal with RED was being cancelled. When I asked [Walsh] why this was happening he stated that the Ketchup Song had created a major issue with Artemis and the powers that be.

As previously noted, during the next two days, internal Artemis e-mails and White's letter to Pace showed—at least arguably—that Artemis was terminating its dealings with 24/7.

A reasonable inference from the evidence presented is that Sony intentionally caused Artemis not only to cancel distribution of the Ketchup Song, but also to terminate the Agreement in its entirety. While Sony points to evidence that supports alternative views—that the Agreement was never terminated, that the termination of the Agreement was contemplated by Artemis long before Sony came into the picture, etc.—deciding between these competing views is for the jury. The evidence is sufficient to permit 24/7's tortious interference and unfair competition claims to proceed.

## CONCLUSION

We have considered the parties' remaining arguments and find each of them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part, and this case is remanded for proceedings consistent with this opinion.