STATE OF CONNECTICUT OFFICE OF PROTECTION AND ADVOCACY FOR PERSONS WITH DISABILITIES and James McGaughey, Executive Director, State of Connecticut, Office of Protection & Advocacy for Persons with Disabilities, Plaintiffs–Appellees,

v.

HARTFORD BOARD OF EDUCATION, Hartford Public Schools and Robert Henry, Supt. of Schools, Defendants–Appellants.

Docket No. 05–1240 CV.

United States Court of Appeals, Second Circuit.

Argued: Feb. 28, 2006.

Final Submission: June 20, 2006.

Decided: Sept. 15, 2006.

**232**

Nancy B. Alisberg, Managing Attorney, Office of Protection & Advocacy for Per-

sons with Disabilities, Hartford, Connecticut, for Plaintiffs–Appellees.

Ann F. Bird, Assistant Corporation Counsel, City of Hartford, Hartford, Connecticut, for Defendants–Appellants.

Peter D. Keisler, Assistant Attorney General, United States Dept. of Justice, Washington, D.C.; Kevin J. O'Connor, United States Attorney for the District of Connecticut, New Haven, Connecticut; Gregory G. Katsas, Deputy Assistant Attorney General; Mark B. Stern and Sharon Swingle, Attorneys, Civil Division, United States Dept. of Justice, Washington, D.C., for Amici Curiae the Department of Education and the Department of Health and Human Services.

Saul P. Morgenstern, Kaye Scholer LLP, New York, New York, for Amicus Curiae National Association of Protection and Advocacy Systems, Inc.

Kelly Balser, Senior Staff Attorney, Connecticut Association of Boards of Education, Wethersfield, Connecticut, for Amicus Curiae Connecticut Association of Boards of Education.

Before: SOTOMAYOR and RAGGI, Circuit Judges, and CEDARBAUM, District Judge.*

SOTOMAYOR, Circuit Judge.

This appeal raises the question of whether the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801–10851 (2000),[1]

---

\* The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation.

1. Enacted in 1986 as the "Protection and Advocacy for Mentally Ill Individuals Act of 1986," Pub.L. No. 99–319, 100 Stat. 478 (May 23, 1986), the Act was commonly referred to by the acronym "PAMII." *See, e.g., Ctr. for Legal Advocacy v. Hammons,* 323 F.3d 1262, 1263 (10th Cir.2003). In 1991, amendments to the Act substituted "individuals with men-

tal illness" for "mentally ill individuals" wherever it appeared in the Act. *See* Pub.L. No. 102–173, § 10(2), 105 Stat. 1217, 1219 (Nov. 27, 1991). The short title, however, remained unchanged. In 2000, Congress amended the short title so that the Act is now known as the "Protection and Advocacy for Individuals with Mental Illness Act" or "PAIMI." *See* Pub.L. No. 106–310, 114 Stat. 1101, 1193–94 (Oct. 17, 2000).

the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. §§ 15001–15115 (2000), and the Protection and Advocacy of Individual Rights Act ("PAIR"), 29 U.S.C. § 794e (2000) (collectively, the "P & A Acts") authorize plaintiffs-appellees the State of Connecticut Office of Protection and Advocacy ("OPA") and its executive director, James McGaughey, (1) to observe and interview students at the Hartford Transitional Learning Academy (the "Academy"), a therapeutic school for students who are seriously emotionally disturbed, in order to investigate complaints of abuse and neglect at the school, and (2) to obtain a directory of students with contact information for their parents or guardians. For the reasons that follow, we hold that the P & A Acts authorize OPA to access the Academy during school hours and to obtain a directory of students and contact information for their parents or guardians.

Defendants-appellants Hartford Board of Education, Hartford Public Schools, and Superintendent of Schools Robert Henry (collectively, "defendants") initially argued on appeal that, even if the P & A Acts authorize OPA to access the Academy and its students and to obtain a list of students and contact information for their parents or guardians, the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g (2000 & Supp. IV), and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1487 (2000 & Supp. IV), nonetheless bar their compliance with OPA's requests. Following oral argument and the submission of a joint amicus brief by the United States Departments of Education and Health and Human Services, however, defendants abandoned their arguments based on FERPA

and the IDEA, and we therefore do not address them. We affirm the injunction.

## BACKGROUND

### I. Factual Background

The Academy is a public school in Hartford, Connecticut, that is under defendants' authority. The Academy provides a "therapeutic educational program" for children who are seriously emotionally disturbed and who present challenging behavioral problems. All students enrolled at the Academy have been identified as requiring special education or related services under the IDEA. The parents or guardians of students enrolled there are required to sign a document acknowledging the school's use of physical restraints and seclusion.

OPA is a state-created agency that is authorized to investigate suspected abuse or neglect of individuals with disabilities or mental illness in Connecticut and to advocate on their behalf. *See* Conn. Gen.Stat. §§ 46a–10 to 46a–11 (2004). It serves as Connecticut's protection and advocacy system ("P & A system") for purposes of PAIMI, 42 U.S.C. § 10801(b)(2), the DD Act, *id.* § 15043(a), and PAIR, 29 U.S.C. § 794e(f), which provide federal funding only for states with qualifying P & A systems that monitor the care of and advocate on behalf of individuals with mental illness and developmental or other disabilities. *See* 29 U.S.C. § 794e(a)(1), (f); 42 U.S.C. §§ 10801, 15001.

OPA alleges that it received complaints from parents of students at the Academy about the inappropriate use of physical restraints and seclusion at the school.[2] Parents also complained that students had been injured during the restraint process.

---

**2.** Under regulations promulgated pursuant to PAIMI and the DD Act, the use of excessive force when placing an individual in physical restraints is considered to be abuse. *See* 42 C.F.R. § 51.2 (PAIMI); 45 C.F.R. § 1386.19 (the DD Act).

As a result of these complaints, as well as allegations that students had been placed at the Academy without proper behavioral assessments or adequate individualized educational plans as required by the IDEA, OPA determined that it had probable cause to suspect that Academy students had been, or were at risk of being, subject to abuse and neglect. In conjunction with the State of Connecticut Office of the Child Advocate ("OCA"), OPA opened an investigation into possible abuse and neglect at the Academy. OCA is a state-created agency charged with monitoring services provided to children by the State of Connecticut or by organizations, such as school districts, that receive state funds, and with reviewing complaints about those services. *See* Conn. Gen.Stat. § 46a–131(a)(1)–(3) (2004).

On February 3, 2004, OPA and OCA sent Superintendent Henry a letter informing him that they had received complaints about the treatment of students at the Academy and would be investigating the alleged "programmatic deficiencies and violations of student rights" pursuant to their authority under federal and state law. The letter further informed Superintendent Henry that OPA and OCA intended to make an initial visit to the Academy at nine o'clock on the morning of February 10, 2004, and that the investigation would include "policy review, record review, interviews and direct observation of practices."

On February 10, 2004, representatives from OPA and OCA visited the Academy as promised. The Academy refused them access to the facility, the students, and the documents they had requested. Representatives from OPA, OCA, and defendants, including Superintendent Henry, met to discuss the matter on April 7, 2004. At the meeting, defendants agreed to, and later did, provide certain documents to OPA and OCA. These documents, however, did not contain any personal information regarding Academy students. Specifically, defendants did not provide the directory information—a list of students and contact information for their parents or guardians—that OPA sought. Defendants also refused to allow OPA and OCA access to the Academy during school hours to observe or interview students. They claimed that access to students and the disclosure of directory information was not authorized by the P & A Acts and was prohibited by FERPA and the IDEA.

## II. Procedural History

### A. The District Court

On August 11, 2004, OPA filed suit in the United States District Court for the District of Connecticut (Janet C. Hall, J.) seeking (1) a declaration that it was entitled to observe and interview students at the Academy during school hours and to obtain a list of the names and contact information for all the students and their parents and (2) a corresponding injunction. Because the parties stipulated to the relevant facts, the district court consolidated the hearings on the preliminary and permanent injunctions. *See Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F.Supp.2d 649, 652 (D.Conn.2005) ("*OPA*").

In a thorough and thoughtful opinion, the district court granted the relief OPA sought. Courts have concluded that a P & A system's inability to meet its federal statutory mandate to protect and advocate for the rights of individuals with disabilities is an irreparable harm for purposes of injunctive relief. *Id.* at 653. With respect to the merits, the district court first concluded that the Academy students fall within the protections of the P & A Acts

on the basis of defendants' concession that most students would be classified as individuals with mental illness within the definition of PAIMI, and OPA's reasonable belief that some, if not most, of the students had developmental or other disabilities given that all the students are diagnosed as "substantially emotionally impaired" and in need of special education and related services. *Id.* at 665–66. The court next held that the Academy was a "facility" under PAIMI that OPA is authorized to access. *Id.* at 657–60. In doing so, the court rejected defendants' assertion that PAIMI does not apply to non-residential facilities or to individuals with disabilities who live at home. *Id.* at 658–59.

The court further held that, under the P & A Acts, OPA is entitled to a list of students and the contact information for their parents or guardians. *Id.* at 661–64. The court concluded that a minor student's parents can be considered his or her "legal guardian[s]" for purposes of the P & A Acts so that OPA can contact them in order to secure consent to view that student's records. *Id.* at 661–62. Finally, the district court held that neither FERPA nor the IDEA bars OPA from obtaining the names and contact information of students and their parents or guardians. *Id.* at 662–63.

The district court thus declared that defendants' refusal to provide OPA with the names and phone numbers of Academy students violated PAIMI, PAIR and the DD Act. It entered a permanent injunction ordering defendants "to grant both physical access and names and contact information such that OPA can perform its statu-

tory duty to investigate suspected abuse and neglect." *Id.* at 664.

Defendants thereafter filed this timely appeal, but they did not seek a stay of the injunction and have complied with its terms.

### B. The Appeal

On appeal, defendants assert that the district court erred in concluding that the Academy is a "facility" to which OPA is entitled to have reasonable access under PAIMI because the implementing regulations limit the term "facility" to residential facilities, which the Academy is not. They also claim that even if the Academy is a facility for purposes of PAIMI, OPA cannot access it or speak with students without the consent of the students' parents or guardians. They further challenge the district court's holding that the P & A Acts authorize OPA, once it has probable cause to believe that abuse or neglect has occurred at the facility, to obtain a general list of Academy students and the contact information for their parents or guardians. Defendants also maintain that the P & A Acts authorize OPA to obtain contact information only for Academy students about whom they have received a specific complaint.

Initially, defendants also asserted that FERPA and the IDEA prohibited them from allowing OPA to access the Academy, its students or the students' contact information. Specifically, they argued that, regardless of any authority OPA might have under the P & A Acts, FERPA and the IDEA prohibit them from allowing OPA to be present at the Academy during school hours or to interview Academy students without the consent of their parents or guardians.[3] Similarly, without such per-

---

**3.** The IDEA requires schools that receive federal funds for special education, such as the Academy, to abide by the terms of FERPA. *See* 20 U.S.C. § 1417(c). It does not impose

any further non-disclosure requirements. We therefore discuss defendants' non-disclosure argument only with reference to FERPA.

**236**

mission, defendants asserted, the release of the names of students and contact information for their parents or guardians is prohibited by FERPA. For the reasons we will explain, defendants have since abandoned these arguments.

Following oral argument, we invited the United States Departments of Education ("DOE") and Health and Human Services ("HHS") to file amicus briefs in this case providing their interpretations of the relevant statutory provisions. DOE and HHS accepted our invitation and filed a joint brief with the Court, which, in significant part, rejects defendants' arguments. With respect to defendants' FERPA defense, the agencies explain that FERPA's nondisclosure requirements are limited to tangible records and information derived from records and that FERPA does not prohibit an OPA representative from observing a classroom or speaking with students. They note that DOE has previously adopted this interpretation in informal guidance. Brief for Amici Curiae Department of Education & Department of Health & Human Services ("United States Br.") at 12–13 & n.5 (citing Dep't of Educ., Dec. 8, 2003 Letter to S. Mamas). DOE and HHS also explain that, to the extent FERPA prohibits defendants from releasing the names and contact information for students who OPA has probable cause to believe were subject to abuse or neglect, the P & A Acts should be construed "as a limited override of FERPA's non-disclosure requirements" in the circumstances presented by this case. United States Br. at 18.

In response to the agencies' submission, defendants notified this Court that, although they do not agree with the view articulated in the joint amicus brief, they will defer to the agencies' interpretation of FERPA. In light of the fact that they are already in compliance with the district court's injunction, defendants state that they consider this appeal to be moot and consent to its dismissal. Bird Letter, June 20, 2006, at 2. Defendants' letter, however, neither makes reference to the agencies' arguments based on the P & A Acts nor expresses similar deference to the agencies' interpretation of those statutes.

OPA responds that the case is not moot. It claims that it still needs the ability to access the Academy and monitor conditions at the school in the future. It also asserts that defendants' prosecution of the appeal, at least until their receipt of the agencies' joint amicus brief, indicates that defendants do not want OPA to have access to the Academy and that absent a ruling on defendants' arguments, they would be free to interpose their objections to OPA's investigations at the Academy based on FERPA in the future. Alisberg Letter, June 20, 2006, at 3–4.

**DISCUSSION**

 This Court reviews a permanent injunction for abuse of discretion, *see Advance Pharm., Inc. v. United States*, 391 F.3d 377, 398 (2d Cir.2004), which occurs when a district court relies on clearly erroneous findings of fact or an error of law, *see S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir.2001). Questions of statutory construction and the appropriate level of deference to accord an agency's interpretation of a statute are questions of law, which we review *de novo. See Prot. & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.*, 448 F.3d 119, 123 (2d Cir.2006).

**I. Mootness**

The first question we must address is whether defendants' deference to DOE's view of FERPA and their consent to dismiss the appeal moots the appeal. We address the latter question first.

■ Under Federal Rule of Appellate Procedure 42(b), parties may seek the voluntary dismissal of a docketed appeal in two ways. Parties may obtain a voluntary dismissal by signing and filing a "dismissal agreement specifying how costs are to be paid and pay[ing] any fees that are due." Fed. R.App. P. 42(b). Alternatively, an appeal may be dismissed on appellant's motion "on terms agreed to by the parties or fixed by the court." *Id.* Here, there is no signed dismissal agreement and defendants have not moved to dismiss the appeal. Their letter to the Court consenting to dismissal is therefore insufficient to dismiss, and thus moot, the appeal. *Cf. British Int'l Ins. Co. v. Seguros La Republica, S.A.,* 354 F.3d 120, 123 (2d Cir.2003) (finding that an appeal was not moot because the parties had failed to file a signed stipulation with the Clerk of the Court as required by Rule 42(b)).

■ That we do not view defendants' letter as a motion to dismiss their appeal, however, does not address the question of whether their deference to DOE's views now moots the appeal. "The mootness doctrine provides that 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Id.* at 122 (quoting *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 n. 10 (1974)). "That the dispute between the parties was very much alive when suit was filed, or at the time [the court of appeals rendered judgment], cannot substitute for the actual case or controversy" the Constitution requires in order for us to exercise our jurisdiction. *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). A case does not become moot, however, if an appellant retains some interest in the case so that a favorable decision could redound to its favor. *See Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 569–70, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984); *Stolt–Nielsen SA v. Celanese AG,* 430 F.3d 567, 576 n. 6 (2d Cir.2005).

Here, because defendants continue to press their arguments with respect to the P & A Acts, the parties remain adverse with respect to at least some of the issues on appeal. There is no question that if we were to render a favorable decision for defendants, they would obtain relief because they would no longer have to comply with the terms of the injunction, which, as noted, requires defendants "to grant both physical access and names and contact information such that OPA can perform its statutory duty to investigate suspected abuse and neglect" and thus has a continuing effect. *See Tory v. Cochran,* 544 U.S. 734, 737, 125 S.Ct. 2108, 161 L.Ed.2d 1042 (2005) (explaining that a case is not moot where it "appears from [the] 'terms' of the injunction that it is 'still in force' and 'unless set aside must be complied with'" (quoting *Firefighters Local Union No. 1784,* 467 U.S. at 569, 104 S.Ct. 2576)). Hence, defendants' deference to DOE's view of FERPA does not moot their appeal.

Although defendants' agreement to defer to the views of DOE does not moot the appeal, it does serve to abandon certain arguments that defendants advanced initially on appeal—that FERPA should be read to bar OPA from accessing the Academy and its students during school hours and from obtaining directory information for students. Accordingly, we do not address defendants' arguments with respect to FERPA (and the IDEA).[4] *See 24/7*

---

4. OPA's apparent concern that defendants' abandonment of their FERPA claims on appeal will allow defendants to challenge the injunction or similar requests for access and information by OPA on this ground in the future seems misplaced. As an initial matter,

*Records, Inc. v. Sony Music Entm't, Inc.,* 429 F.3d 39, 43 (2d Cir.2005) (declining to consider arguments abandoned on appeal). We therefore turn to defendants' remaining claims on appeal.

## II. Access to the Academy

Defendants contend that the district court erred in finding that the P & A Acts authorize OPA to access the Academy and speak with its students for investigatory purposes. They argue that PAIMI authorizes OPA to have reasonable access only to residential facilities and that PAIR and the DD Act do not authorize the investigation of an entire school.

### A. PAIMI

PAIMI authorizes P & A systems such as OPA to "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 10805(a)(1)(A). It further provides that a P & A system "shall ... have access to facilities in the State providing care or treatment." *Id.* § 10805(a)(3). Under PAIMI, the term "facilities" "may include, but need not be limited to, hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons." *Id.* § 10802(3).

■ Defendants do not dispute that the Academy is a facility that provides care or treatment to individuals with mental illness—specifically, children who are seriously emotionally disturbed. Instead, defendants argue that, on the basis of the statute's plain language and its implementing regulations, the term "facilities" under PAIMI includes only residential facilities. They point to the illustrative list of facilities at § 10802(3), which they claim consists solely of residential facilities.

Defendants assert further that we must defer to HHS's regulation defining a "facility" under PAIMI as "any public or private residential setting that provides overnight care accompanied by treatment services." 42 C.F.R. § 51.2. Defendants contend that this definition is reasonable because, unlike residential facilities such as hospitals or jails, day facilities like the Academy do not isolate students from their families or the community such that they would require the services of a P & A system. Defendants further note that school children have a number of sources of protection and advocacy available to them, including the rights conferred on parents by the IDEA and the requirement that teachers and most school district employees report suspected cases of abuse.

OPA responds that this argument does not acknowledge that, after HHS promul-

we note that defendants' deference to DOE and their abandonment of their FERPA arguments on appeal mean that they do not challenge so much of the district court ruling as rejected those claims.

Moreover, although a determination of whether defendants are precluded from raising FERPA to refute any of OPA's future requests to investigate allegations of abuse or neglect must abide that event, we note that defendants' abandonment of their FERPA arguments on appeal does not alter the fact that the FERPA arguments have been litigated in this case, were decided by the district court,

were necessary to the judgment on the merits, and were not challenged on appeal. *See Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 146 (2d Cir.2005) ("[I]ssue preclusion[ ] applies where: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." (internal quotation marks and citation omitted)).

gated its regulatory interpretation of the term "facilities" in 1997, Congress amended PAIMI in 2000 to extend its protection to individuals with mental illness who live in the community. *See* Children's Health Act of 2000, Pub.L. No. 106–310, § 3206(b)(1)(B), 114 Stat. 1101, 1194 (2000). That is, prior to 2000, the definition of an "individual with mental illness" for purposes of the Act was limited to individuals who were inpatients or residents of a care or treatment facility. *See* Pub.L. No. 99–319, Title I, § 102(3)(B), 100 Stat. 478, 479 (1986). In 2000, however, Congress amended the definition of "an individual with mental illness" under the Act to include "an individual—(A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and . . . (ii) . . . lives in a community setting, including [his or her] own home." 42 U.S.C. § 10802(4).

OPA contends that these amendments make clear that PAIMI's protections extend to individuals who attend day programs like the one at the Academy. Because the Academy is a "community facilit[y] for individuals with mental illness" that "provid[es] care or treatment," *id.* §§ 10802(3), 10805(a)(3), OPA argues, it is a facility to which OPA is empowered to have reasonable access under PAIMI.

HHS, which is charged with issuing regulations interpreting and implementing PAIMI, *see id.* § 10826, also maintains that the term "facilities" in the statute includes non-residential facilities that provide care and treatment of individuals with mental illness. The amicus brief HHS filed with DOE in this case states that it "interprets the investigatory authority of a P & A pursuant to the PAIMI Act as extending to any facility providing care

and treatment to the mentally ill, regardless of whether the facility is residential." United States Br. at 10. It asserts that this interpretation is most consistent with the text of PAIMI and the legislative purpose of the 2000 amendments, which were passed to "strengthen community-based mental health services and enable children with severe emotional disturbances to 'remain in local communities rather than being sent to residential facilities.'" United States Br. at 9 (quoting S.Rep. No. 106–196, at 6 (1999)). In consequence, HHS rejects defendants' argument that the definition of "facility" codified at 42 C.F.R. § 51.2 controls here.

Where, as here, an agency advances a statutory interpretation in an amicus brief that has not been articulated before in a rule or regulation, we do not apply the high level of deference due under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 80, 82 (2d Cir.2004) (concluding that an informal opinion in an amicus brief by the SEC does not have the force of law and therefore does not warrant *Chevron* deference). That does not mean, however, that we give no deference to the agency's view. *See United States v. Mead Corp.*, 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Rather, a reasonable agency determination, when advanced in an amicus brief that is not a *"post hoc rationalizatio[n],"* *Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (internal quotation marks omitted), may be entitled to some deference on account of the "specialized experience" and information available to the agency. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *see also Mead*, 533 U.S. at 234–35, 121 S.Ct. 2164; *In re New Times Sec. Servs.*, 371 F.3d at

82–83. Under *Skidmore*, the weight we give an agency's judgment is based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. 161.

Evaluating the *Skidmore* factors here, we conclude that HHS's interpretation merits deference. The definition of "facilities" set forth in § 10802(3) does not distinguish between residential and day facilities. Although many of the examples of facilities included in Congress's illustrative list are of a residential character, Congress also included "community facilities for individuals with mental illness." The rubric "community facilities" does not appear, on its face, to be limited to residential programs. Moreover, reading the facility-access provision as limited to residential facilities is contrary to Congress's clearly expressed intent to provide protection and advocacy services for individuals with mental illness living in their own homes. *See* 42 U.S.C. § 10802(4). We therefore conclude that the regulatory interpretation of "facilities" HHS promulgated in 1997 is no longer consistent with PAIMI after the 2000 amendments. We defer instead to the reasonable interpretation advanced by HHS in this case—that the term "facilities" for purposes of PAIMI includes non-residential facilities that provide care or treatment to individuals with mental illness.

Here, the Academy is a school that provides a therapeutic educational program for students who are seriously emotionally disturbed. It is therefore a facility to which OPA must have reasonable access under PAIMI.

**B. PAIR and the DD Acts**

■ PAIR and the DD Act also grant access to certain facilities providing services to individuals with developmental disabilities. The DD Act provides that a P & A system must "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual, in order to carry out the purpose of this part." 42 U.S.C. § 15043(a)(2)(H). The Act provides further that the "purpose of this part is to provide for allotments to support a protection and advocacy system ... in each State to protect the legal and human rights of individuals with developmental disabilities in accordance with this part." *Id.* § 15041. PAIR incorporates these provisions of the DD Act. *See* 29 U.S.C. § 794e(f) (providing that a P & A system has the same authority under PAIR as under the DD Act for individuals who are disabled but neither have mental illness within the meaning of PAIMI nor developmental disabilities within the meaning of the DD Act).

Defendants argue that § 15043(a)(2)(H) authorizes a P & A system to speak only with specific individuals in a service location, and not to *all* individuals served by that location. That is, they contend that, because § 15043(a)(2)(H) provides OPA with access to "any individual ... in a location ... in order to carry out the purpose of this part" and that the purpose of this part is to " 'investigate incidents of abuse and neglect of individuals,' " Appellant's Br. at 14 (quoting 42 U.S.C. § 15043(a)(2)(B)), OPA has authority only to observe or speak with those students it has reason to believe have been subject to abuse or neglect. In short, they maintain, the DD Act does not give OPA generalized access to the Academy facility and its students. We disagree.

Defendants conflate § 15043(a)(2)(B) with § 15043(a)(2)(H). The former subsection provides P & A systems access to

facilities and permits them to speak with individuals in order to investigate specific incidents of suspected abuse or neglect. The latter subsection provides more generalized access to any individual with a disability in a location that provides services in order to carry out the statutory purpose of protecting the rights of such persons. Defendants' argument that a P & A system has the authority to access a service location under § 15043(a)(2)(H) only for the purpose of investigating a specific incident—a right conferred by § 15043(a)(2)(B)—would render § 15043(a)(2)(H) meaningless because it would authorize only those activities authorized by subsection (B). We decline to read the statute in a way that would create a redundancy. *See Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("It is … a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." (citation and internal quotation marks omitted)).

In addition, the DD Act's implementing regulations clearly provide that P & A systems have the authority to interview all individuals at a particular facility:

> A system shall have reasonable unaccompanied access to public and private facilities which provide services, supports, and other assistance for individuals with developmental disabilities in the State when necessary to conduct a full investigation of an incident of abuse or neglect under section 142(a)(2)(B) of the [DD] Act. This authority shall include the opportunity: to interview any facility service recipient, employee, or other person, including the person thought to be the victim of such abuse, who might be reasonably believed by the system to have knowledge of the incident under investigation; and to inspect, view and photograph all areas of the facility's premises that might be believed by the system to have been connected with the incident under investigation.

45 C.F.R. § 1386.22(f); *see also id.* § 1386.22(g) (noting that the system "shall have unaccompanied access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours" for the purposes of fully investigating alleged abuse and neglect).[5] *See Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.,* 97 F.3d 492, 497 (11th Cir. 1996) ("It is clear that [the DD] Act provides express authority for P & As to gain broad access to records, facilities, and resi-

---

**5.** Like PAIMI, the DD Act was amended by Congress after this regulation was promulgated to extend its protections to individuals not living in residential facilities. *See* Developmental Disabilities Assistance and Bill of Rights Act of 2000, Pub.L. No. 106–402, § 143(a)(2)(H), 114 Stat. 1677, 1715 (2000). The prior version of the DD Act, pursuant to which HHS promulgated its regulation, limited a P & A system's access to residents of a facility for persons with disabilities. *See* 42 U.S.C. § 6042(a)(2)(H) (1994) (repealed) (providing that P & A systems shall "have access at reasonable times and locations to any resident who is an individual with a developmental disability in a facility that is providing services, supports, and other assistance to such resident"). To the extent that HHS's

regulation interprets the statute's former language to limit P & A systems' access only to individuals with developmental disabilities in residential locations, the regulation has been superseded by congressional enactment and is not controlling.

In the joint amicus brief, HHS implicitly reads the regulation promulgated at 45 C.F.R. § 1386.22(g) to provide access to any individual with a developmental disability in a location that provides services, regardless of whether the individual is a resident of the location. Although we are not called upon to defer to this interpretation, we note that it is consistent with the plain language of the DD Act, as amended, which authorizes OPA to have physical access to all individuals in the location for monitoring purposes.

dents to ensure that the Act's mandates can be effectively pursued."); *Pennsylvania Prot. & Advocacy, Inc. v. Royer–Greaves Sch. for the Blind*, 1999 WL 179797, at *6 (E.D.Pa. Mar.25, 1999) (holding that "reasonable access includes general facility access without notice, and patient access with twenty-four hour notice"); *Mississippi Prot. & Advocacy System, Inc. v. Cotten*, 1989 WL 224953, at *8–9 (S.D.Miss. Aug.4, 1989) (noting that P & A systems must have "frequent personal contact" with individuals receiving services, and that "[c]entral to the concept of authority to investigate is the ability to interview witnesses"), *aff'd*, 929 F.2d 1054, 1059 (5th Cir.1991) (noting court's "full accord" with district court's conclusions regarding necessity of P & A access to individuals).

■ Moreover, the "purpose" of this part of the DD Act is not as limited as defendants maintain, but rather aims to protect the legal and human rights of individuals with developmental disabilities. *Id.* § 15041 (defining the "purpose of this part"). To this end, the statute provides access to service recipients for both investigatory and monitoring purposes, i.e., to investigate past instances of suspected abuse or neglect and to monitor to ensure current respect for the rights and safety of service recipients. *Id.* § 15043(a)(2)(B), (H). Simply put, the requirement in § 15043(a)(2)(B) that a P & A system have the authority under the Act to investigate specific incidents does not limit a P & A system to that power alone.

The records-access provision of the DD Act also supports the view that a P & A system has the authority to have physical access to a location and to observe and speak with service-recipients for monitoring purposes. It provides that a P & A system may view the records of an individual with a disability when, *inter alia*, "as a result of *monitoring or other activities,*

there is probable cause to believe that such individual has been subject to abuse or neglect." 42 U.S.C. § 15043(a)(2)(I)(iii)(II) (emphasis added). This language indicates that Congress intended P & A systems not simply to respond to reports of maltreatment, but also to monitor facilities in order to prevent abuse or neglect.

In sum, to the extent that the Academy is a location that provides care or treatment to individuals with disabilities within the meaning of PAIR and the DD Act, OPA is authorized to have reasonable access to the Academy and its students during school hours both to investigate specific allegations and to monitor whether the school is respecting students' rights and safety.

## C. Parental Permission

■ Defendants next argue that even if PAIMI, PAIR and the DD Act generally authorize OPA to access a facility such as the Academy, OPA cannot do so here without permission from the students' parents or guardians. For this argument, they rely on the P & A Acts' records-access provisions, which require a P & A system, except in certain emergency situations, to obtain consent from the individual, if he or she is an adult and can consent, or the individual's legal guardian prior to obtaining an individual's records. *See* 42 U.S.C. §§ 10805(a)(4) (PAIMI), 15043(a)(2)(I) (DD Act).

This argument need not detain us long. The DD Act and PAIMI distinguish between a P & A system's authority to speak with an individual and its authority to obtain an individual's records. As discussed above, the DD Act provides that a P & A system must have reasonable access to individuals. *See* 42 U.S.C. § 15043(a)(2)(H). Similarly, PAIMI provides that OPA must have reasonable access to individuals in facilities that provide

care or treatment for individuals with mental illness. *See* 42 U.S.C. § 10805(a)(3). Nothing in the statutory language of either the DD Act or PAIMI conditions this access on the consent of an individual's parents or guardians.

That parental consent is not required is also supported by the regulations interpreting and implementing this section. PAIMI's implementing regulations define "reasonable access" for monitoring purposes to include reasonable unaccompanied access to programs and individuals in order to ensure that their rights are being protected, including the right to speak or otherwise communicate with individuals, including minors. 42 C.F.R. § 51.42(c). As noted in the previous section, this regulation refers to "residents," which reflects the statutory definition of an "individual with mental illness" at the time the regulation was promulgated. In the joint amicus brief, HHS reads this provision to apply to Academy students, who plainly are not "residents" of the facility. United States Br. at 12 ("Under the statute and implementing regulations, a P & A's authority to access individuals or facilities is not conditioned on parental notification or consent." (citing 42 C.F.R. § 51.42(d)-(e))). We read this regulation consistently with HHS's interpretation in the joint amicus brief. *See generally In re New Times Sec. Servs., Inc.,* 371 F.3d at 82–83; *accord McCormick ex rel. McCormick v. Sch. Dist.,* 370 F.3d 275, 290 (2d Cir.2004) (noting that courts generally defer to an agency's reasonable interpretation of its regulation).

Contrary to the access provisions, PAIMI and the DD Act are very explicit about what type of authorization is required for a P & A system to view an individual's records: they detail from whom a P & A system must have authority to access records and when prior consent is necessary.

*See* 42 U.S.C. §§ 15043(a)(2)(I), 10805(a)(4). That Congress provided explicit and detailed authorization provisions with respect to an individual's records but did not do so with respect to a P & A system's right to access a facility suggests that it did not intend to require a P & A system to obtain authorization prior to visiting a facility to observe conditions or interact with the individuals receiving services in that facility. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks and citation omitted; alteration in original)); *see also Burlington N. & Santa Fe Ry. Co. v. White,* —— U.S. ——, ——, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345 (2006) (explaining that where Congress uses different words, it is presumed that Congress intended the different words to make a legal difference). We therefore decline defendants' invitation to read a parental-consent provision into the statute where none exists.

### III. Parent/Guardian Contact Information

Defendants next argue that the district court erred in ordering it to release to OPA a directory of students containing contact information for their parents or guardians. The only arguments they press on appeal are that the P & A Acts do not require the release of this information and that, even if they do, the district court erred in requiring them to release the information for all students. We consider these arguments in turn.

### A. The P & A Acts Authorize the Disclosure of Contact Information

Defendants assert that the district court erred in requiring them to give OPA

the names and contact information for Academy students because the P & A Acts do not expressly require them to disclose this information.

The DD Act, PAIR and PAIMI each permit OPA to access records in certain situations. Although there are some differences among the Acts, they require, broadly speaking, that a P & A system have access to an individual's records upon the consent of the individual or his or her guardian and in certain emergency situations. *See* 42 U.S.C. §§ 10805(a)(4), 15043(a)(2)(I)-(J). They also permit a P & A system to have access to an individual's records if the individual's representative fails to act after a P & A system has received contact information for the representative, contacted that person concerning possible abuse or neglect of the individual, and offered assistance in resolving the situation. Specifically, the DD Act provides that a P & A system must have access to an individual's records where there is probable cause to believe that the individual has been subject to abuse or neglect, the individual's representative "has been contacted by such system, upon receipt of the name and address of such representative; ... such system has offered assistance to such representative to resolve the situation; and ... such representative has failed or refused to act on behalf of the individual." 42 U.S.C. § 15043(a)(2)(I)(iii)(III)-(V). PAIMI has a similar provision, but requires that a P & A system have probable cause to believe that the "health or safety of the individual is in serious and immediate jeopardy." 42 U.S.C. § 10805(a)(4)(C). The implementing regulations for the DD Act and PAIMI further provide that if a P & A system is denied access to an individual's records for, *inter alia,* alleged lack of authorization, it shall be provided with the name of the guardian of that individual. 42 C.F.R. § 51.43; 45 C.F.R.. § 1386.22(i).

OPA concedes that none of the P & A statutes explicitly requires that the Academy give it a list of students and contact information for their parents or guardians. Nonetheless, it contends that because a P & A system cannot obtain consent to access a student's records from the student's guardian without the guardian's name or contact information, but it can obtain the guardian's name if it is denied access to an individual's records for lack of authorization pursuant to the governing regulations, it is therefore entitled to a list of students and contact information for their parents or guardians. OPA further asserts that the Academy's failure to disclose this information impedes its statutory duty under the P & A Acts and is contrary to the clear spirit, if not the exact letter, of the laws.

In the joint amicus brief filed in this case, HHS and DOE take the position that the records-access provisions of the P & A Acts "expressly contemplate that a school or other facility will provide contact information to a P & A in order to allow the P & A to carry out its responsibility to investigate abuse or neglect." United States Br. at 14. The agencies assert that, to the extent that OPA has made the requisite probable cause determinations, OPA has a clear right to contact information for those students' parents or guardians. *Id.* at 14–15.

We find persuasive the agencies' view that Congress intended a P & A system to be able to obtain the names and contact information for the parents or guardians of students at the Academy. By conditioning access on the consent of an individual or, if the individual cannot consent, his or her legal guardian or representative, the Acts require that P & A systems contact the guardians of individuals with disabilities or mental illness if they have the requisite prior cause to believe that abuse or neglect

is occurring at the facility. This interpretation is consistent with Congress's view that "family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors." 42 U.S.C. § 10801(a)(2). Hence, we conclude that OPA is authorized under PAIMI, the DD Act and PAIR to obtain the names of Academy students and contact information for their parents or guardians.[6]

## B. Scope of the Injunction

■ Similar to its argument with respect to whether OPA can speak with students, defendants maintain that the district court erred in requiring that they disclose the names and contact information for all Academy students. Defendants assert that the P & A Acts require the release of the names and contact information only for those particular individuals whom OPA has reason to believe have been victims of an incident of abuse or neglect, not for an "entire school of individuals." In short, they contend that the injunction is overly broad in scope.

■ District courts have broad authority in crafting equitable remedies such as injunctions. *Bano v. Union Carbide Corp.*, 361 F.3d 696, 716 (2d Cir.2004) (citing *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973)). Accordingly, "appellate review is correspondingly narrow." *Lemon*, 411 U.S. at 200, 93 S.Ct. 1463. The question, therefore, is whether the district court exceeded its allowable discretion in ordering defendants to disclose the names and contact information of all Academy students.

Here, the district court concluded that OPA had probable cause to obtain the disclosure of this information. *See OPA*, 355 F.Supp.2d at 661. Defendants do not advance any arguments that this determination was in error, and we see none. Although OPA presumably did not receive a specific complaint about each student, it submitted evidence that it had complaints about the operation of particular policies that led to inappropriate restraint and seclusion and that those policies operated school-wide. Given that these allegations are system-wide, OPA could have reason to believe that all students at the school had been, were being, or were at risk of being neglected or abused.

Further, although the P & A Acts speak in terms of the "individual" or "an individ-

---

6. In the district court, defendants also asserted that the access provisions discussed in the text do not apply because Academy parents are not the legal guardians, conservators or legal representatives of the Academy students. *See* 42 C.F.R. 51.2 (defining these terms under PAIMI to include only those persons whose appointment is made and regularly reviewed by the State); 45 C.F.R. § 1386.19 (same under the DD Act). *But see* 62 Fed. Reg. 53,548, 53,552 (Oct. 15, 1997) (explaining in the comments to the final rule that, with respect to minor children, the "natural or adoptive parents are legal guardians unless the State has appointed another legal guardian under applicable State law"). "[C]rediting the agency's interpretation of its own regulation," and noting that the P & A Acts expressly contemplated a role for family members, the district court held that it could not conclude that "parents are excluded from the definition of a 'Legal Guardian, Conservator, and Legal Representative.'" *OPA*, 355 F.Supp.2d at 662.

On appeal, defendants initially asserted that the district court erred in this holding because it conflicts with FERPA's prohibition on the disclosure of parental identities without giving notice to parents and an opportunity for them to request that their identities not be disclosed. Because defendants abandoned their FERPA arguments after oral argument in this case, and advance no other argument with respect to the district court's reasoning, we also deem this argument abandoned and do not address it further. *See State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 172 (2d Cir.2004).

ual," nothing in the statute suggests that OPA cannot seek authorization for a number of individuals if it has made a probable cause determination that multiple individuals have been subjected to abuse or neglect at a facility. As HHS has noted, "neither the Act nor case law imposes an individual-specific probable cause requirement," and a probable cause determination could be made on the basis of "general conditions or problems that affect many or all individuals in a facility." Substance Abuse and Mental Health Services Administration; Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Final Rule, 62 Fed.Reg. 53,548, 53,559 (Oct. 15, 1997); *see also Pa. Prot. & Advocacy, Inc. v. Royer–Greaves Sch. for Blind,* 1999 WL 179797, at *9–10 (E.D.Pa. Mar.25, 1999) (finding that a P & A system was authorized to obtain a list of the names and addresses of the guardians of the students at a residential school for children with developmental disabilities and blindness where the P & A system had received complaints of "systemic neglect" at the school); *see also Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d 1150, 1171–72 (N.D.Ia.2001) (suggesting that probable cause to believe that widespread abuse is occurring justifies generalized access to records).

Finally, defendants' assertion that the district court erred in ordering the disclosure of the names of all Academy students and the contact information for their parents and guardians rings hollow in light of their simultaneous argument that OPA must have parental consent prior to undertaking any investigative or monitoring activities at the school. Given that the vast majority of Academy students are minors whose parents or guardians have a strong interest in the protection of their rights and well-being, *see* 42 U.S.C. § 10801(a)(2), we cannot say that the district court

abused its discretion in requiring defendants to provide the names and contact information for all Academy students.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.